**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AssuredPartners of Arizona LLC, | No. CV-25-03849-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Jason Barrios, et al., | |
| Defendants. | |

Before the Court is Plaintiff AssuredPartners of Arizona LLC's ("Plaintiff" or "AP") Motion for Preliminary Injunction (Doc. 2) against Defendants Jason Barrios and Sequel Insurance Services, Inc. (collectively, "Defendants"). Plaintiff and Defendants have filed supplemental briefing (*see* Docs. 52, 54), and a hearing on the matter was held on December 18, 2025 (Doc. 58).

Following the hearing, Plaintiff filed a Motion for Leave to File a Post-Hearing Brief (Doc. 64), to which Defendants filed a Response in Opposition (Doc. 65). The Court did not request supplemental briefing, and both parties had equal opportunity to submit pre-hearing briefs and present oral argument. Moreover, Defendants have not submitted any countervailing post-hearing brief, so it would be inequitable to consider Plaintiff's. Thus, Plaintiff's Motion for Leave to File a Post-Hearing Brief (Doc. 64) is denied.

**I.  Background**

Plaintiff is an insurance brokerage firm, which facilitates the sale of insurance policies. (Doc. 27 at ¶ 31). Defendant Jason Barrios ("Barrios") began his employment

with Plaintiff in 2018, working as an insurance producer. (*Id.* at ¶ 10).

During his time at AP, Barrios worked with the then-president of AP's Sacramento office, Owen Taylor ("Taylor"). (Doc. 67 at 39). Taylor acted as a mentor to Barrios, providing him with guidance, particularly concerning the captive insurance field. (*Id.* at 44). While employed with AP, Barrios co-founded a captive insurance program, DeliverRE, with the help of Taylor and another insurance professional, Monica Everett ("Everett") in January 2021. (Doc. 67 at 55; Doc. 52-3 at ¶ 6; Doc. 52-4 at ¶ 4). DeliverRE is a "captive insurance program focused on Amazon Delivery Service Providers." (Doc. 52-3 at ¶ 6). Since its founding, Barrios has held the role of DeliverRE's Lead Broker and performed various duties for the captive relating to that role. (*Id.* at ¶¶ 6, 7). In January 2021, Barrios disclosed his role with DeliverRE to AP. (*Id.* at ¶ 7).

On or around July 19, 2023, Barrios signed a Restrictive Covenant Agreement ("RCA") with AP.[1] (*See generally* Doc. 27-2). Amongst other items, the RCA included provisions on the use of AP's confidential information and the non-solicitation of clients and employees. (*See id.*). His RCA, additionally, reflected his position and stated "[Barrios] will continue to receive 100% of the Lead Broker Fee from the DeliverRE Captive for the duration of [Barrios's] employment at [AP]." (Doc. 27-2 at ¶ 1(c)).

Around 2023, Taylor left AP to start Defendant Sequel Insurance Services, Inc. ("Sequel"), and he is currently Sequel's Chief Executive Officer ("CEO"). (*See* Doc. 52-5 at ¶ 2 (Taylor has served as Sequel's CEO "for over two years.")). Despite his departure from AP, Taylor continued to mentor Barrios and field emails from him about captive insureds. (Doc. 52-5 at ¶ 3). Throughout this time, Barrios continued in his role with DeliverRE and his employment with AP, servicing captive and non-captive clients, until his resignation. (*See* Doc. 52-3 at ¶ 16).

Barrios left AP on October 7, 2025, to join Sequel. (Doc. 67 at 42, 58). That same day, Barrios's call logs show that he made around one hundred calls, and, by the following

---

[1] Barrios entered into the RCA with AssuredPartners of California. (*See* Doc. 27-2 at 2). However, effective September 1, 2023, the RCA was assigned to AssuredPartners of Arizona, Plaintiff in these proceedings. (Doc. 27-3).

1  day, Barrios had contacted around 85% of his book of business. (Doc. 54-1 at 18). The
2  calls were made using the contacts on Barrios's phone that he gained during his
3  employment at AP, though Barrios maintains that the contact information was publicly
4  available. (Doc. 67 at 58). Barrios is presently servicing his clients that moved their
5  business from AP to Sequel. (Doc. 52-3 at ¶ 17; Doc. 67 at 46). Additionally, prior to his
6  departure from AP, Barrios emailed two spreadsheets to Taylor, one about captive
7  businesses and the other about non-captive businesses. (Doc. 54-1 at 15). After learning
8  of this lawsuit, Barrios admittedly and mistakenly deleted the spreadsheets, but they were
9  recovered and produced for the purposes of this litigation. (*Id.*; Doc. 52-3 at ¶ 13).

When Plaintiff became aware of the above developments, it filed this lawsuit and a Motion for Temporary Restraining Order and Preliminary Injunction on October 16, 2025, claiming that Barrios breached his RCA and misappropriated trade secrets. (*See* Docs. 1-2). The Court held a hearing on Plaintiff's Motion for Temporary Restraining Order on October 20, 2025, wherein Plaintiff requested that the Court enforce Barrios's non-solicitation and confidential information covenants as well as determine that Barrios misappropriated its trade secrets. (*See generally* Docs. 2, 18, 55). Upon the conclusion of the hearing, the Court denied the Motion, determining that Plaintiff had not demonstrated a protectable trade secret and questioning the enforceability of some of the RCA's provisions. (*See* Doc. 55 at 35–36). The parties then conducted expedited discovery and attended a hearing on Plaintiff's Motion for Preliminary Injunction on December 18, 2025. (Doc. 58).

II. **Legal Standards**

Injunctive relief is an "extraordinary remedy only granted upon a clear showing that a [petitioner] is entitled to such relief." *Nat'l Ass'n for Gun Rts., Inc. v. Motl*, 188 F. Supp. 3d 1020, 1028 (D. Mont. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The standards governing temporary restraining orders and preliminary injunctions are "substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citation omitted). On an application for a temporary restraining order or

- 3 -

preliminary injunction, the plaintiff has the burden to establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm if the preliminary relief is not granted, (3) the balance of equities favors the plaintiff, and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 5, 20 (2008).

In the Ninth Circuit, the *Winter* factors may be evaluated on a sliding scale: "serious questions going to the merits, and a balance of hardships that tips sharply toward the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). "To reach this sliding scale analysis, however, a moving party must, at an 'irreducible minimum,' demonstrate some chance of success on the merits." *Global Horizons, Inc. v. U.S. Dep't of Lab.*, 510 F.3d 1054, 1058 (9th Cir. 2007) (citing *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987)).

The movant carries the burden of proof on each element of the test. *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The plaintiff may meet this burden if it "demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Johnson v. Cal. St. Bd. of Acct.*, 72 F.3d 1427, 1429 (9th Cir. 1995) (internal quotation marks and citation omitted).

**III.    Discussion**

Plaintiff argues that it can show a likelihood of success on the merits that (1) Barrios misappropriated Plaintiff's trade secrets and (2) Barrios has breached several provisions of the parties' RCA. (Doc. 54 at 8–18). Further, Plaintiff claims that it can establish irreparable harm warranting injunctive relief and that the remaining *Winter* factors militate in its favor. (*Id.* at 18–21). Defendants disagree, arguing, in large part, that Barrios's separate role with DeliverRE negates Plaintiff's claims. (Doc. 52 at 6–10).

**A.     Likelihood of Success on the Merits**

The first *Winter* factor requires Plaintiff to show a likelihood of success or serious questions going to the merits of its claims for breach of contract and misappropriation of trade secrets. A reasonable probability of success is all that need be shown for preliminary injunctive relief—an overwhelming likelihood is not necessary. *Candrian v. RS Indus., Inc.*, 2013 WL 2244601, *3 (D. Ariz. 2013) (citing *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991)).

"Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Gilder*, 936 F.2d at 422 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2nd Cir. 1953)). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

**1.     Misappropriation of Trade Secrets**

Plaintiff has brought claims under both the Defend Trade Secrets Act ("DTSA") and the Arizona Uniform Trade Secrets Act ("AUTSA"), the elements of which are substantially similar. "To state a claim under the DTSA, Plaintiff must allege (1) that it owns a trade secret, (2) that was misappropriated by Defendants, (3) causing damages." *Gordon Grado M.D., Inc. v. Phoenix Cancer and Blood Disorder Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 809 (D. Ariz. 2022); *see also* A.R.S. § 44-401 *et seq.* (requiring plaintiff to prove that (1) that a legally protectable trade secret exists and (2) that the defendant misappropriated the trade secret through improper means).

For purposes of the first element, a trade secret is "financial, business, scientific, technical, economic, or engineering information" that the owner takes reasonable measures to keep secret and the information derives independent economic value from being a secret. 18 U.S.C. § 1839(3). A plaintiff need not spell out the details of the trade secret but must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade . . . and to permit the defendant to ascertain

- 5 -

at least the boundaries within which the secret lies." *Vendavo, Inc. v. Price f(x) AG*, 2018 WL 1456697, at *4 (N.D. Cal. 2018) (internal citation omitted).

Based on the Court's prior ruling on its TRO and the expedited discovery conducted by the parties, Plaintiff's trade secret claim has changed from its original conception. Plaintiff has now identified three alleged trade secrets:

1. A "2025 Captive Revenue" Spreadsheet that is a compilation of captive clients, listing their policy effective dates, captive names, and revenue ("Captive Revenue Spreadsheet") (Doc. 54 at 14);

2. A "2025 Non-Captive Revenue" Spreadsheet that is a more detailed compilation of client information, including client names, policy effective dates, lines of coverage, carrier information, policy numbers, revenue, and notes ("Non-Captive Revenue Spreadsheet") (*id.* at 14–15); and

3. Client contact information contained in Barrios's phone. (*Id.* at 15–16).

The Court will examine in turn whether any of the three categories of information are protectable trade secrets.

### a.     The Spreadsheets

"The Ninth Circuit has held that a customer list qualifies as a trade secret 'because it allows a competitor…to direct its sales efforts to those potential customers that are already' doing business with the plaintiff." *Extreme Reach, Inc. v. Spotgenie Partners*, LLC, 2013 WL 12081182, *3 (C.D. Cal. 2013) (citing *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993)). Courts have determined that customer lists that include non-public information like rate information and purchasing histories likely qualify as trade secrets. *Id.* at *4 (distinguishing a case where a list containing only names and addresses of potential clients was not found a trade secret). Plaintiff also cites *Accretive Specialty Ins. Sol., LLC v. OPT Partners, LLC*, 2024 WL 1699509 (C.D. Cal. 2024) to reaffirm that "[s]ince [defendants] accessed [plaintiff's] client list as well as specific information regarding quotes and policy expiration dates for its clients, [plaintiff] has sufficiently defined its Trade Secrets." *Id.* at *9.

Here, on first glance, the Captive Revenue Spreadsheet and particularly the Non-Captive Revenue Spreadsheet (collectively, the "Spreadsheets") could constitute trade secrets under the DTSA and the AUTSA. Like *Extreme Reach* and *Accretive*, Plaintiff's spreadsheets held not only client names but also policy effective dates, revenue, lines of coverage, and other information. AP's employee asserts that AP considers the information confidential as it would be highly useful in competing for business. (Doc. 54-1 at 82).

However, arguments raised by Defendants cast significant doubt as to whether the Spreadsheets qualify as trade secrets. Barrios claims that he had access to the information in both spreadsheets through his independent role as Lead Broker of DeliverRE and therefore would not consider the data "confidential" to AP. (Doc. 52-3 at ¶ 10). Even more so, Barrios claims that the information in the spreadsheets is accessible from public and third-party sources, such as CarrierOK and Central Analysis Bureau. (*Id.* at ¶ 11; Doc. 67 at 53:1-14). The public availability of the information in the spreadsheets raises serious questions as to whether they are trade secrets. *Experian Info. Sols., Inc. v. Nationwide Mktg. Services Inc.*, 893 F.3d 1176, 1188 (9th Cir. 2018) ("A trade secret does not consist of 'matters of public knowledge.'"). Such a compilation can be a trade secret if it is shown that substantial efforts were spent cultivating the lists and that it would be difficult for a competitor to acquire the same information. *Calisi v. Unified Fin. Services, LLC*, 302 P.3d 628, 632 (Ariz. Ct. App. 2013) ("A customer list may also be entitled to trade secret protection if the claimant demonstrates it compiled the list by expending substantial efforts to identify and cultivate its customer base such that it would be difficult for a competitor to acquire or duplicate the same information."). However, Plaintiff did not provide any evidence about its efforts to compile the spreadsheets or show the court that a competitor may have difficulty in acquiring the information.

Based on Barrios's sworn statements and the lack of countervailing evidence refuting them, Plaintiff has not shown at this stage that the information in the Spreadsheets is Plaintiff's protectable trade secrets.

**b.    Client Contact Information**

Plaintiff next claims that the client contact information contained in Barrios's phone is a protectable trade secret. (Doc. 54 at 16). Plaintiff cites *E*Trade Fin. Corp. v. Eaton*, 305 F. Supp. 3d 1029 (D. Ariz. 2018) to support its claim. There, the defendant "admitted at the hearing that he left his employment with *E*Trade* having retained in his cell phone contact information for approximately ten clients, and that retention of confidential client information was a violation [] of the Agreement." *Id.* at 1033. Thus, the court determined, from that evidence alone, that defendant "breached [] the Agreement, by taking client contact information and not returning or deleting it upon or after his departure from E*Trade." *Id.* However, the court, in finding a likelihood of success on the plaintiff's breach of contract claim, did not determine that the cell phone contact information was a trade secret. *C.f. Perrin Bernard Supowitz, LLC v. Morales*, 2023 WL 1415572, *8 (C.D. Cal. 2023) ("[T]he Court cannot conclude that the contact information [plaintiff] had for a given customer or its decisionmaker constitutes a trade secret.).

A plaintiff may not rely on "catchall" phrases or categories of trade secrets. *Race Winning Brands, Inc. v. Gearhart*, 2023 WL 4681539, *5 (C.D. Cal. 2023) (citing *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020)). "[C]lient contact information in his cell phone" is too vague to qualify as a trade secret. *See 3D Systems, Inc. v. Wynne*, 2025 WL 886958, *4 (S.D. Cal. 2025) ("[Plaintiff] does not, for instance, offer any specific 'vendor' name or 'supplier contact information' that it asserts as a trade secret."); *Gearhart*, 2023 WL 4681539 at *5 (determining that general areas of information, including "customer lists, customer contacts, and customer sales," were insufficient to adequately identify a trade secret) (internal quotation marks omitted). Moreover, as above, Barrios asserts that his role as DeliverRE's lead broker gave him access to information such as each insured's "contact name, secondary contact name, phone, [and] email" (Doc. 52-3 at ¶ 6), making it difficult to conclude that any client contact information is proprietary to Plaintiff.

Based upon the evidence before the Court, Plaintiff has not established that it owned

a trade secret by way of the Revenue Spreadsheets or client contact on Barrio's phone. Without a trade secret, Plaintiff has not demonstrated a likelihood of success on the merits as to its DTSA or AUTSA claims.

### 2. Breach of Contract

Turning to Plaintiff's breach of contract claim, the Court will first assess the merits of the claim, then, if necessary, determine whether the restrictive covenants are reasonable and enforceable under these circumstances.

#### a. Breach of Contract Merits

To prevail on a breach of contract claim under Arizona law, "a plaintiff must show a contract, a breach of contract, and damages." *Best W. Int'l, Inc. v. Patel*, 523 F. Supp. 2d 979, 988 (D. Ariz. 2007) (*citing Graham v. Asbury*, 540 P.2d 656, 657 (Ariz. 1975)).

The parties have a valid, enforceable Restrictive Covenant Agreement ("RCA"), and Plaintiff states that it has fully performed its contractual duties. (Doc. 27 at ¶178). Plaintiff claims that its restrictive covenants are no more restrictive than necessary and consistent with industry standards. (*Id.* at ¶175). Plaintiff argues that Barrios primarily breached three provisions of the RCA: the non-service provision, non-solicitation provision, and the nondisclosure/confidential information provision. (Doc. 54 at 11–13). In pertinent part, the RCA states:

> Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of Company or, where appropriate, Employer Group. Employee agrees to comply with all Company or, where appropriate, Employer Group, policies governing the use and protection of Confidential Information. Accordingly, both during and after employment with Company (whether such separation from employment is voluntary or involuntary), Employee shall not take, copy, duplicate in any way, use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment. The duration of the obligation of non-disclosure and non-use of Confidential Information that is not a Trade Secret is eighteen (18) months after Employee's employment with Company ends (whether voluntarily or involuntarily) (the "Restricted Period"). The obligation of non-disclosure and non-use of Trade Secrets, however, shall continue to exist for so long as such information maintains Trade Secret status under applicable law, except as otherwise limited above.

It also provides that

> Except on behalf of Company, during Employee's employment with Company and for the Restricted Period, Employee shall not directly or indirectly through another person or entity:
> (i) solicit, sell, provide or renew any Insurance Products or Related Services to any Restricted Client or Active Prospective Client; or
> (ii) service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client.

(Doc. 27-2 at 3–4).

At this point, it has been established that, shortly after resigning at AP, Barrios reached out to the majority of his clientele to inform them of his move to Sequel. (Doc. 67 at 60–61). *See Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 981–82 (D. Ariz. 2006) (finding that a letter sent by defendant informing clients of his resignation and including his new company contact information was a solicitation); *Merrill Lynch, Pierce, Fenner & Smith v. McClafferty*, 287 F.Supp.2d 1244, 1248 (D. Haw.2 003) (holding that a "wedding-style announcement," even assuming it was sent as a matter of professional courtesy, was a solicitation where it was directed toward and based on client lists). These conversations, at times, included a "nudge" to clients to submit their BOR letters. (Doc. 67 at 62). Further, while maintaining that he challenges the enforceability of the non-servicing provision, Barrios has stated that he is currently servicing clients on behalf of Sequel that were in his book of business at AP. (Doc. 54-1 at 11). Lastly, Barrios shared multiple spreadsheets with Taylor and failed to return them upon departure. (Doc. 52-3 at ¶ 10 (Barrios stating that he emailed the Spreadsheets to Sequel)).

Based on the foregoing evidence, Plaintiff has established a reasonable likelihood of success on its breach of contract claim.[2]

---

[2] Defendants argue and Barrios avers that Plaintiff waived "conflicting duties" under the RCA during his employment at AP. (*See* Doc. 52 at 7). However, the RCA contains a provision that states amendments or modifications must be in writing and "no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect, or enforceability of this Agreement." (Doc. 27-2 at ¶ 16). Defendants' position is not supported by any legal authority to overcome this provision, and the factual record regarding any extraneous agreements between AP and Barrios is not well developed at this time.

### b.  Reasonableness of the Covenants

Although a reasonable likelihood of success has been established, the Court's inquiry does not end there. Plaintiff has made it clear that they are seeking to enforce the non-solicitation and non-servicing provisions of the RCA against Barrios. (Doc. 54 at 3). However, the enforceability of the non-servicing agreement is disputed by the parties.

Arizona law does not necessarily forbid non-solicitation and non-servicing agreements and instead requires courts to balance the employer and employee's competing interests. *See Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1283 (Ariz. 1999). Whether a restrictive covenant is reasonable is a question of law. *Id.* at 1280. "The burden is on the party wishing to enforce the covenant to demonstrate that the restraint is no greater than necessary to protect the employer's legitimate interest, and that such interest is not outweighed by the hardship to the employee and the likely injury to the public." *Id.* at 1286. Moreover, restrictive covenants "are strictly construed against the employer." *Amex Distrib. Co., Inc. v. Mascari*, 724 P.2d 596, 600 (Ariz. Ct. App. 1986).

#### i.  Non-Solicitation Agreement

The Court finds that the non-solicitation provision reasonably protects AP's interests without causing Barrio undue hardship. To reiterate, during the Restricted Period, Barrios is prohibited from "solicit[ing], sell[ing], provid[ing], or renew[ing] any Insurance Products or Related Services to any Restricted Client or Active Prospective Client." (Doc. 27-2 at ¶ 3(a)(i)). The Restricted Period under the RCA is eighteen months. (*Id.* at ¶ 2(c)). Additionally, Restricted Clients are those for which the employee received compensation, had material and ongoing involvement with, and received confidential information from in the twelve months preceding the end of the employee's employment; and Active Prospective Clients are those which the employee made material efforts in soliciting and received confidential information from in the six month preceding the end of their employment. (*Id.* at ¶¶ 3(b–c)).

Arizona courts have acknowledged that because non-solicitation agreements are "less restrictive on the employee (and thus on free market forces) than a covenant not to

compete, an anti-piracy agreement ordinarily is not deemed unreasonable or oppressive." *Hilb, Rogal & Hamilton Co. of Arizona v. McKinney*, 946 P.2d 464, 467 (Ariz. Ct. App. 1997). However, a covenant that is too restrictive can still can still be rendered unenforceable. *Id.* In *Brown & Brown Insurance of Arizona, Inc. v. New*, the court considered a similar non-solicitation agreement arising in the insurance brokerage context. 2024 WL 945687, *3 (Ariz. Ct. App. 2024). There, the court upheld a two-year non-solicitation clause because the agreement did not preclude the former employees from working in the same industry and are "ordinarily reasonable." *Id.* (citing *Hilb*, 946 at P.2d at 467). Here, the RCA is for a lesser time period than that in *New*, and it expressly states that the time period is the industry standard and allows for two renewal cycles to occur. (Doc. 27-2 at ¶ 3(e)). Moreover, the RCA limits the implicated clients to those with which Barrios was actually involved. *C.f. Karp v. Avella of Deer Valley Inc.*, 2013 WL 5435212, *1 (D. Ariz. 2013) ("The [non-solicitation] provision thus prohibits Plaintiff from having contact even with customers or suppliers with whom he had no prior relationship on behalf of Defendant. Arizona courts do not enforce such provisions."). As its scope and time is supported under Arizona law, Plaintiff's eighteen-month non-solicitation provision is reasonable to protect its interests.

### ii.     Non-Servicing Restriction

The more difficult question is whether the non-servicing aspect of the RCA is enforceable under these circumstances. Baked into the RCA's non-solicitation provision is an agreement for Barrios not to "service any Insurance Products or Related Services on behalf of any Restricted Client or Active Prospective Client," for the duration of the Restricted Period. (Doc. 27-2 at ¶ 3(a)(ii)).

As stated during the hearing, the Court continues to have reservations about the non-servicing provision because it essentially has the effect of binding non-parties to the parties' agreement. *See, e.g.*, *Getman v. USI Holdings Corp.*, 2005 WL 2183159, *3 (Mass. Super. 2005) ("To be sure, none of these clients were informed that, should [plaintiff] leave [defendant], they would be barred from continuing to do business with him

at his new employ for three years."). At the same time, the Court takes Plaintiff's point that other courts have upheld non-servicing provisions. *See, e.g.*, *Aitkin v. USI Ins. Services, LLC*, 607 F. Supp. 3d 1126, 1143 (D. Or. 2022). But the fact that similar covenants have been upheld alone does not establish that this particular covenant should be, especially in light of the unique circumstances presented. *Bryceland v. Northey*, 772 P.2d 36, 40 (Ariz. Ct. App. 1989) ("Each case hinges on its own particular facts.").

"Reasonableness is a fact-intensive inquiry that depends on the totality of the circumstances." *Farber*, 982 P.2d at 1283. "[I]n the commercial context, the employer's interest in its customer base is balanced with the employee's right to the customers. Where the employee took an active role and brought customers with him or her to the job, courts are more reluctant to enforce restrictive covenants." *Id.* at 1284. With this in mind, the Court will consider the reasonableness of the provision in regard to the DeliverRE captive's clients.

During his employment with AP, in January 2021, Barrios "co-founded the DeliverRE captive." (Doc. 52-3 at ¶ 6; Doc. 54-1 at 10). In his role as Lead Broker, he would "(a) interview and train newly appointed brokers (including non-AP brokers); (b) oversee all appointed brokers that sell into the program (including non-AP brokers); (c) assist brokers (including non-AP brokers) with closing new business; (d) ensure all brokers are following the DeliverRE Code of Conduct; (e) attend board and committee meetings with captive members; (f) make recommendations to the board of directors on various issues; and, (g) assist with the Request for Proposal process when captive members are exploring new options for service providers/vendors." (*Id.*) Barrios credibly avers that he "disclosed to AssuredPartners that [he] was the Lead Broker for the DeliverRE captive program [and that] Assured Partners was aware [he] had certain separate insurance functions and revenue streams from that capacity." (*Id.* at ¶ 7). The RCA, in fact, acknowledges Barrios's role as Lead broker of DeliverRE. Specifically, it states that "[Barrios] will continue to receive 100% of the Lead Broker Fee from the DeliverRE Captive for the duration of [Barrios's] employment at [AP]." (Doc. 27-2 at ¶ 1(c)).

Plaintiff asserts that Barrios worked with AP's "Captives Team," a group of employees with expertise in the provision of captive insurance services, throughout his employment. (Doc. 54-1 at 78–79). And during the hearing, the Court heard broad strokes testimony that AP developed DeliverRE through its resources and expertise as a large-scale broker. Conversely, Barrios presented testimony that AP did not assist in building DeliverRE and that it was launched between himself, Taylor, and Everett, DeliverRE's current captive manager. The Court notes that, outside of her role with DeliverRE, Everett is the "Founder and President of International Captive Consulting" and does not appear to be affiliated with AP. (Doc. 52-4 at ¶ 2). The prominent role played by a non-AP employee in DeliverRE is telling as to the independence of the captive. (*Id.* at ¶ 4 ("Although Jason Barrios acts as an employee in a separate capacity for insurance companies, he has an independent role and revenue stream from DeliverRE, as its Lead Broker.")).

Courts recognize the that reasonable non-servicing agreements between employers and their employees can be necessary to protect an employer's good will with its clients. *See, e.g.*, *Aitkin*, 607 F. Supp. 3d at 1142-43. However, Barrios's separate role with DeliverRE and involvement in its founding speak more to *his* goodwill with the affiliated clientele than AP's. *USI Ins. Services LLC v. Alliant Ins. Services Inc.*, 2023 WL 3792749, *9 (D. Ariz. 2023) ("Arizona law…requires courts to balance the employer and employee's competing interests.").

While the exact bounds of the relationships between AP, Barrios, and DeliverRE have not yet been established, what is clear is that Barrios founded DeliverRE during his employment at AP but maintained a distinct role as the captive's Lead Broker. His role with DeliverRE was acknowledged by Plaintiff, and Barrios performs functions for the captive beyond the scope of his former role at AP. Under these particular circumstances and at the current stage of proceedings, the Court does not find it reasonable to enforce the non-service agreement as to the DeliverRE captive clients. Similarly, the non-service provision is not reasonable to enforce the provision against any of Barrios's clients that pre-date his employment at AP. *Farber*, 982 P.2d at 1284 ("Where the employee took an

active role and brought customers with him or her to the job, courts are more reluctant to enforce restrictive covenants."). Based on the testimony before the Court, these two categories encompass all of the implicated clients Barrios is currently servicing.

### B. Irreparable Harm

Under the second *Winter* factor, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Forefront Dermatology S.C. v. Crossman*, 642 F. Supp. 3d 947 (D. Ariz. 2022) (quoting *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.*; *see also All. for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original) ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."). Irreparable harm is harm "that cannot be redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted); *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("[E]conomic injury alone does not support a finding of irreparable harm, because such injury can be remedied by a damage award.").

Plaintiff argues that imminent irreparable harm has been established because "Defendants remain in possession of AP's trade secrets" and they have already "taken three employees and dozens of clients that generate roughly $1.7M in annual revenue." (Doc. 54 at 18). Plaintiff asserts that "Defendants' actions have also caused irreparable damage to AP's goodwill and relationships with its clients, as the sudden loss of the bulk of AP's captive insurance clients will eradicate the goodwill that AP has developed in this industry and will hinder AP's ability to grow the business." (*Id.*)

First, as established above, Plaintiff has not yet established a trade secret that it owns. Moreover, Barrios has attested that he deleted the Spreadsheets, unaware of his duty to maintain all records, but the documents were later recovered and produced. (Doc. 52-3

at ¶ 13). And there is presently no indication that Barrios is in possession of Plaintiff's confidential information. Barrios also claims that his separate role as DeliverRE's Lead Broker allows him access to client contact information. (Doc. 52-3 at ¶ 7). Barrios may have been well-advised to delete his old contacts and re-compile them, but, as he has his own access to the clients' contact information, it is not clear to the Court how the retention of the contact information causes or will cause Plaintiff irreparable harm.

Next, courts have acknowledged that the loss of customers, business reputation, and customer goodwill can constitute irreparable harm. *See Tribal Behavioral Health LLC v. Reeves*, 2022 WL 2290563, *12 (D. Ariz. 2022). However, bald assertions of loss of goodwill and customers, unsupported by record evidence, are insufficient to establish irreparable harm. *See Cutting Edge Solutions, LLC v. Sustainable Low Maintenance Grass, LLC*, 2014 WL 5361548, *5-7 (N.D. Cal. 2014); *Notification Technologies, Inc. v. Parlant Technology, Inc.*, 2005 WL 8173034, *3-4 (S.D. Cal. 2005). Here, it has been established that clients have left AP, and Barrios made statements to at least one client that called into question AP's ability to service the client. (Doc. 54-1 at 130). The Court is, otherwise, without any evidence that shows that Plaintiff has experienced or is likely to experience a loss of goodwill or reputation. Moreover, a loss of goodwill claim is tenuous as the record demonstrates how Barrios's individual contributions and expertise have developed the DeliverRE captive.

Ongoing solicitations, in violation of contractual provisions, have been acknowledged to cause irreparable harm. *See, e.g.*, *K.W. Brock Directories Inc. v. Arvig Enterprises Inc.*, 2025 WL 3033688, *5 (D. Ariz. 2025) ("[the defendant] has made a sufficient showing that [the plaintiff] is continuing to actively solicit [the defendant's] customers, therefore causing irreparable harm to [the defendant]."). Nevertheless, Plaintiff claims that, within a day after his resignation, "Barrios reached roughly 85% of the clients he serviced at AP." (Doc. 54 at 5). No other solicitations occurring in the following months have been demonstrated. This leads to the conclusion that this has now become a matter of ameliorating past harm, not preventing ongoing, imminent harm. *See Allworth*

*Financial LP v. Pivato*, 2023 WL 3570084, *3 (E.D. Cal. 2023) ("Plaintiff's evidence only shows past conduct that occurred over three weeks ago. Regardless…Plaintiff must still show that the threat of injury in the future is 'certainly impending' or that it presents a 'substantial risk' of recurrence for the Court to hear its claim for prospective relief").

Lastly, Plaintiff states that Barrios's actions resulted in the loss of $1.7 million in annual business for AP and approximately $100,000.00 of Barrios's book of business remains at AP. The fact that Plaintiff has been able to quantify its damages and is aware of the dollar amount of Barrios's remaining book of business demonstrates that any harm established by Plaintiff is remediable by economic damages. *See id.* at *4 ("Plaintiff argues it has lost the accounts of over 33 households and $40 million in assets under management because of Defendant's conduct. This argument suggests Plaintiff's damage can be quantified.").

Overall, Plaintiff has not demonstrated imminent irreparable harm that cannot be rectified by economic damages. "Without showing irreparable harm, the Plaintiffs have failed to meet their burden for issuing a preliminary injunction." *Defs. of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009). Notwithstanding the Court's ruling, Barrios should bear in mind his contractual obligations under the RCA.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 2) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Post-Hearing Brief (Doc. 64) is **DENIED**.

Dated this 20th day of February, 2026.

Honorable Diane J. Humetewa
United States District Judge